Commonwealth *v.* Kelly, Appellant.

Argued November 29, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Louis Marcus*, with him *Charles J. Roney*, for appellant.

*Vincent A. Carroll*, Assistant District Attorney, with him *Charles F. Kelley*, District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, January 27, 1939:

This is an appeal from the sentence of death imposed upon defendant, William Kelly, after he was convicted of murder in the first degree upon an indictment charging him with the malicious killing of Police Officer Henry Berry.

At about 1 p. m., on March 17, 1938, defendant entered the jewelry store of Max Perlstein at 1018 Girard Avenue, Philadelphia. He claimed that his intention was to sell two revolvers to Perlstein but the latter testified as follows: "He [defendant] came in the store. I walked around the counter, and I asked him what he

wished, and he pointed a blue automatic revolver at me and told me to be quiet and give him my money. . . . I said to him, 'All right,' and I walked over to the safe. . . . As I was standing right near my safe I looked back, and I seen that he didn't move, and he was . . . about 15 feet away from me, and pointing the gun towards the side. . . . So I quick jumped into the flower store, and . . . ran on down the street and hollered, 'Hold up.' " Defendant also fled.

A young colored girl, Mary Johnson, who had heard Perlstein's cries of "Hold up," followed defendant until they came where Police Officer Berry was directing traffic; and she then said to the latter: "Arrest that man. He held up the jewelry store on Girard Avenue." Officer Berry thereupon chased defendant a short distance, took him into custody, searched him, found one of the guns, and then took him to a truck. As the patrolman was opening the truck door, defendant pulled another gun (together with a handkerchief) out of the left-hand pocket of his overcoat and fatally shot the officer through the chest and spine. Defendant contended that the shooting was accidental. Another eyewitness to the shooting testified that the "colored man pulled out a gun from his overcoat pocket, from the left side, and he changed it over to the right hand, and when the officer was facing the driver and opening the door the man turned around like this and shot the officer in the chest."

Detectives later took the defendant into custody, and when they were walking along the street defendant threw up his hands, knocked one of the officers away and tried to escape. They shot him five times, and then took him to the hospital where on the next day they secured a four-page statement from him.

Defendant testified at the trial that he was out of employment and went to Perlstein's jewelry store "with the intention of selling the two revolvers." He said: "I placed the automatic on the counter. This man [Perlstein] behind the counter, when he saw it, he jumps back,

He said, 'What is this?' I said, 'Wait a minute.' He kept on going back. . . . I said, 'Wait a minute,' so I can explain.' . . . He kept running back . . . until he got to the place where he started yelling unmercifully. He kept yelling and ran to the other side. . . . I ran out of the place. . . . When I got down to the street the officer came up behind me and he stuck his revolver in my back and said, 'Stop.' So, I turned around and said, 'What have I done, Officer?' He said, 'You know what you done.' . . . He reached his hand in my left-hand coat pocket and took this revolver out. . . . He got me out in the street and was holding me there for the truck. I was all wet around there from perspiring. . . . I reached my hand in my pocket to get a handkerchief . . . and he grabbed my hand, 'What are you doing there,' like that, and bringing it up, the thing went off, to my surprise. . . . He collapsed and I went down. . . . I wasn't making any move or running from them or anything like that. After they got me out here and stopped this car . . . and as I went in, my foot slipped, and I stumbled, and when I made the stumble, the shooting took place. They hit me. . . . When I came to . . . I was in the hospital, . . . the detectives questioned me. I couldn't hardly talk on account of my throat. They kept on asking me and I was trying to give them a statement the best I could." He added: "What I was signing to, I didn't know. . . . There was nothing to do, but sign." The Magistrate testified that he read the statement to defendant and the latter admitted it was his. In the statement the defendant said: "The automatic was pulled out of my pocket [by the officer]; he kept twisting my wrist trying to get the gun and I tried to get the gun away. I had my finger on the trigger and the next thing I knew the gun went off."

The jury returned a verdict of first degree murder with capital punishment. Then followed a motion for a new trial, its denial, the imposition of the death penalty, and this appeal.

Appellant complains of many alleged trial errors and emphasis is laid on that part of the court's charge reading as follows: "No accidental killing can possibly follow the perpetration of, or attempt to perpetrate a robbery, or the acts connected with it." This statement is too broad. The Act of March 31, 1860, P. L. 382, sec. 74, as amended by the Act of May 22, 1923, P. L. 306, provides that "all murder which shall be perpetrated by means of poison, or by lying in wait or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of or attempting to perpetrate any arson, rape, robbery, burglary or kidnapping, shall be deemed murder of the first degree." A killing of a human being in order to be murder must be done maliciously. "Malice aforethought is an element of murder in either degree and distinguishes it from manslaughter": *Com. v. Gibson*, 275 Pa. 338, 119 A. 403. There is some divergence of opinion in other jurisdictions as to what acts of a person engaged in the perpetration or attempted perpetration of any of the above felonies will make the felon guilty of murder when the death of another results from such acts. POLLOCK, C. B., in *Regina v. Lee*, 4 F. & F. 63, 176 Eng. Reports 468, makes this statement: "There is an ancient principle of law that if a man in the committal of a felony uses violence to the person, which causes death, even although he did not intend it, he is guilty of murder." In Wharton's Criminal Law (12th ed.), Vol. 1, page 747, sec. 511, appears the following: "It has sometimes been said that a homicide in the perpetration of, or attempt to perpetrate, any arson, rape, robbery, or burglary, is, under the Pennsylvania and cognate statutes, murder in the first degree. But it must be remembered that the statutes under criticism do not say that 'homicide,' when so committed, . . . at common law can be murder either in the first or second degree; and we have first to inquire, in determining the grade of any particular homi-

cide under the statutes, whether it is murder at common law."[1]

In 13 R. C. L., p. 845, sec. 148, it is declared: "It may be stated generally that a homicide is committed in the perpetration of another crime, when the accused, intending to commit some crime other than the homicide, is engaged in the performance of any one of the acts which such intent requires for its full execution, and, while so engaged, and within the res gestæ of the intended crime, and in consequence thereof, the killing results. It must appear that there was such actual legal

---

[1] Stephen in his History of the Criminal Law of England, Vol. 3, page 21, said that at common law murder was homicide with malice aforethought and that the latter consisted of any of the following states of mind:

1. An intention to cause the death of, or grievous bodily harm to, any person, whether such person is the person actually killed or not.

2. Knowledge that the act or omission which causes death will probably cause the death of, or grievous bodily harm to, some person, whether the person killed or another, although such knowledge is accompanied by indifference whether death or grievous bodily harm is caused or not, or by a wish that it may not be caused.

3. An intent to oppose by force any officer of justice in arresting or keeping in custody a person whom he has a right to arrest or keep in custody, or in keeping the peace.

4. An intent to commit any felony whatever.

Blackstone, Vol. 4, pages 192, 193, says: "When an involuntary killing happens in consequence of an unlawful act, it will be either murder or manslaughter according to the nature of the act which occasioned it. If it be in prosecution of a felonious intent or in its consequences naturally tended to bloodshed, it will be murder; but if no more was intended than a mere civil trespass, it will only amount to manslaughter."

Halsbury's Laws of England (2d ed.), (1933), Vol. 9, 437, states the modern common law doctrine in England regarding felony murders, as follows: "Where a person whilst committing or attempting to commit a felony does an act . . . known to be dangerous to life and likely in itself to cause death, and the death of another person results as a consequence of that act, though not intended by the person committing it, the law implies malice aforethought, and the person causing the death is guilty of murder."

relation between the killing and the crime committed or attempted, that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it. In the usual terse legal phraseology, death must have been the probable consequence of the unlawful act." Wharton's Homicide (3d ed.), page 184, sec. 126, declares: "To render a killing without malice murder in the first degree under statutes making it murder in the first degree to kill in the perpetration of a felony, or of specified felonies, it must have been done in pursuance of the unlawful act, and not collateral to it. The killing must have had an intimate relation and close connection with the felony, and not be separate, distinct, and independent from it; and when the act constituting the felony is in itself dangerous to life, the killing must be naturally consequent to the felony," (citing *Rex v. Plummer*, J. Kelyng 109, 12 Mod. 627).

In *Com. v. Lessner*, 274 Pa. 108, 118 A. 24, this Court held that when in the commission or attempted commission of a robbery there is "no break in the chain of events" between the felony and the shooting which caused death, even though "the discharge [of the gun] was unintentionally caused [by the felon] while struggling with his victim, or with a third party who came to the latter's assistance," the defense of accidental killing is inadmissible and the homicide is, under the statute, "murder of the first degree." There the killing was at the scene of the attempted robbery, the robbers having been surrounded immediately after they had forced their way out of the store they had attempted to rob. In *Com. v. Morrison*, 266 Pa. 223, 109 A. 878, the defendant who had attempted to rob a store, killed a man who had "joined in the pursuit" as the defendant fled. This court held that the murder had its inception in the attempt to perpetrate a robbery, that "no intervening act broke the series of events" from the attempted robbery to the homicide and that the conviction of the defendant of murder

of the first degree was therefore warranted. See also *Com. v. Sterling,* 314 Pa. 76, 170 A. 258; *Com. v. Tauza,* 300 Pa. 375, 150 A. 649; and *Com. v. McManus,* 282 Pa. 25, 127 A. 316. To *this* Commonwealth one must answer as a *malicious* criminal for any fatal injury he here causes a human being by anything done by him intentionally or unintentionally during the commission or attempted commission of any of the specified felonies, for malice is the mainspring of his outlawed enterprise and his every act within the latter's ambit is imputable to that base quality. Such a rule is essential to the protection of human life.

In order for a homicide which is committed in the perpetration or attempted perpetration of any of the enumerated felonies, to be adjudged murder of the first degree, there must be "no break in the chain of events" and the homicidal act must be "connected" with the initial maliciously motivated offense. It follows therefore that to instruct a jury that "no accidental killing can possibly follow the perpetration or attempt to perpetrate a robbery or the acts connected with it," is error. A person who attempts a robbery or any other of the enumerated felonies may have completely abandoned his attempt and be far from its locus when he accidentally or otherwise does some act which results in another's death. As Chief Judge CARDOZO said in *People v. Moran,* 246 N. Y. 100, 158 N. E. 35: "The very meaning of flight is desistance or abandonment, unless indeed, in special circumstances as in cases where a thief is fleeing with his loot."[2] If a robber is fleeing with his loot, his flight is in

---

[2] In *People v. Walsh et al.,* 262 N. Y. 140, 186 N. E. 422, 424, the Court of Appeals of New York, after declaring that the question of whether or not the homicide charged occurred during the commission of a felony, was one of fact, said: "It should have been left to the jury under instructions pointing out generally that the killing to be felony murder must occur while the actor or one or more of his confederates is engaged in securing the plunder or in doing something immediately connected with the underlying crime *(Do-*

furtherance of the robbery, for the latter is not consummated until the loot is reduced to the felon's complete dominion.

When the indictment charges that a murder was committed in the perpetration or attempted perpetration of any of the enumerated felonies, *the jury* must first decide whether the homicidal act was connected with the felony or was there "a break in the chain of events." The court below erred in taking it upon itself to decide that basic question. The court charged: "It is not contradicted that the officer was attempting to take the defendant into custody at the time, that he had hailed a truck for that purpose, and certainly the attempted perpetration of the crime was not concluded at that time." This Court declared in *Com. v. Doris*, 287 Pa. 547, 551, 135 A. 313, that "whether the act of departing is a continuous part of the attempted or accomplished crime is for the jury: *Com. v. Major*, 198 Pa. 290, 47 A. 741." See also *Com. v. Crow*, 303 Pa. 91, 97, 154 A. 283, where the trial judge properly "left to the jury the question as to whether the homicide was committed in an attempt to perpetrate a robbery and stated that if they so found it would be murder of the first degree." In the instant case, whether or not the defendant attempted to rob the store of Perlstein and whether or not that attempt had been abandoned before the officer was shot were questions of fact to be submitted to the jury under proper instructions. Even if the jury should find that though there had been an attempt to rob Perlstein, it had been completely aban-

lan v. People, 64 N. Y. 485); that escape may, under certain unities of time, manner, and place, be a matter so immediately connected with the crime as to be part of its commission *(People v. Giro*, 197 N. Y. 152, 90 N. E. 432); but that, where there is no reasonable doubt of a complete intervening desistance from the crime, as by the abandonment of the loot and running away, the subsequent homicide is not murder in the first degree without proof of deliberation and intent: *People v. Marwig*, 227 N. Y. 382, 125 N. E. 535, 22 A. L. R. 845."

doned at the time of the shooting, a verdict of guilty of murder of the first degree would nevertheless be warranted if the jury found that the defendant killed the officer *wilfully, deliberately* and *with premeditation.* The fatal use of a deadly weapon against a vital part of another's body when established as a fact warrants an inference that the act was done with a specific intent to take life and so justifies a verdict of guilty of murder of the first degree.

The judgment is reversed and a new trial ordered.