Commonwealth ex rel. Smith, Appellant, v.
Myers.

Argued November 20, 1968. Before BELL, C. J.,
JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Ellen Q. Suria,* with her *John R. Suria, Martin Vinikoor,* Assistant Defender, and *Herman I. Pollock,* Defender, for appellant.

*James D. Crawford,* Assistant District Attorney, with him *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE O'BRIEN, January 30, 1970:

This is an appeal from the order of the Court of Common Pleas of Philadelphia County, denying James Smith's petition for a writ of habeas corpus. The facts upon which the convictions of appellant and his co-felons, Almeida and Hough, rest are well known to this Court[1] and to the federal courts.[2] In addition to vexing the courts, these cases have perplexed a generation of law students, both within and without the Commonwealth, and along with their progeny, have spawned reams of critical commentary.[3]

---

[1] See *Commonwealth v. Hough,* 358 Pa. 247, 56 A. 2d 84 (1948) ; *Com. ex rel. Hough v. Maroney,* 402 Pa. 371, 167 A. 2d 303 (1961), cert. denied, 366 U.S. 971 (1961) ; *Com. ex rel. Hough v. Maroney,* 425 Pa. 411, 229 A. 2d 913 (1967) ; *Commonwealth v. Almeida,* 362 Pa. 596, 68 A. 2d 595 (1949), cert. denied, 339 U.S. 924 (1950), rehearing denied, 339 U.S. 950 (1950) ; *Com. ex rel. Almeida v. Baldi* (361 Misc. Docket No. 9, 1950), cert. denied, 340 U.S. 867 (1950) ; *Com. ex rel. Almeida v. Rundle,* 409 Pa. 460, 187 A. 2d 266 (1963), cert. denied, 374 U.S. 815 (1963). Cf. *Commonwealth v. Thomas,* 382 Pa. 639, 117 A. 2d 204 (1955) ; *Commonwealth v. Redline,* 391 Pa. 486, 137 A. 2d 472 (1958).

[2] *United States ex rel. Hough v. Maroney,* 247 F. Supp. 767 (W.D. Pa. 1965), (writ granted) ; *United States ex rel. Almeida v. Baldi,* 104 F. Supp. 321 (E.D. Pa. 1951), (writ granted), aff'd 195 F. 2d 815 (1952), cert. denied, 345 U.S. 904 (1953), rehearing denied, 345 U.S. 946 (1953).

[3] It would be virtually impossible to catalogue all of the articles on these cases which have been published in the learned journals. Some of the more enlightening include Morris, *The Felon's Responsibility for the Lethal Acts of Others,* 105 U. Pa. L. Rev. 50

Briefly, the facts of the crime are these. On January 30, 1947, Smith, along with Edward Hough and David Almeida, engaged in an armed robbery of a supermarket in the City of Philadelphia. An off-duty policeman, who happened to be in the area, was shot and killed while attempting to thwart the escape of the felons. Although the evidence as to who fired the fatal shot was conflicting in appellant's 1948 trial, the court charged the jury that it was irrelevant who fired the fatal bullet: "Even if you should find from the evidence that Ingling was killed by a bullet from the gun of one of the policemen, that policeman having shot at the felons in an attempt to prevent the robbery or the escape of the robbers, or to protect Ingling, the felons would be guilty of murder, or if they did that in returning the fire of the felons that was directed toward them." To this part of the charge appellant took a specific exception.

The jury convicted Smith of first degree murder, with punishment fixed at life imprisonment. He filed no post-trial motions, and took no appeal. Nor did Smith initiate any post-conviction proceedings until the instant case, despite the litigious propensities of his cofelons.

On February 4, 1966, appellant filed the present petition for a writ of habeas corpus. In his petition appellant raised the following contentions: first, that he had been denied his right to appeal and his right to the assistance of counsel on appeal from his conviction; second, that he was denied his constitutional right to a fair trial by reason of the knowing use of false testimony by the prosecution; and third, that he was denied his constitutional right to a fair trial by reason

(1956); Ludwig, *Foreseeable Death in Felony Murder*, 18 U. Pitt. L. Rev. 51 (1956); and Case Notes, 71 Harv. L. Rev. 1565 (1958), and 106 U. Pa. L. Rev. 1176 (1958).

of the trial judge's charge to the jury, quoted above, which was allegedly inconsistent with the rule later announced by this Court in *Commonwealth v. Redline,* 391 Pa. 486, 137 A. 2d 472 (1958).

The court below held two hearings which were confined to the presentation of evidence in support of appellant's contention that he was denied his right to appeal. The other contentions raised by the appellant were briefed and argued to the court below, but not passed on below. The court below held that appellant had knowingly waived his right to appeal, and although the opinion does not discuss the question, the denial of relief necessarily manifested a belief by the court below that appellant was aware of his right to counsel on appeal. The other issues raised by appellant were not mentioned by the court, apparently of the view that they were cognizable only if it appeared that appellant had been denied his right to appeal, and was entitled to an appeal nunc pro tunc.

We reverse, grant the writ, allow an appeal nunc pro tunc, and grant a new trial. Appellant urges that the evidence clearly shows that he was unaware of his right to appeal from the conviction, and of his right to appointed counsel on appeal. On the other hand, the Commonwealth urges the opposite just as strongly. The Commonwealth contends that appellant was well aware of his right to appeal and his right to appointed counsel on appeal, but deliberately declined to appeal because of his fear of receiving the death penalty upon retrial if he should be successful in gaining a new trial. The Commonwealth argues in its brief: "The major consideration in appellant's choice was the possibility of a death sentence on retrial."

In view of the recent decisions in the companion cases of *Commonwealth v. Littlejohn* and *Commonwealth v. Archambault,* 433 Pa. 336, 250 A. 2d 811 (1969), we need not decide the extremely close factual

question of why Smith failed to appeal. *Littlejohn* and *Archambault* involved defendants who had failed to file post-trial motions or take an appeal because of an alleged fear of receiving the death sentence if successful in obtaining a new trial. In a thorough analysis of the constitutional issues involved, we held that it was violative of a defendant's constitutional rights to be placed in jeopardy of a death sentence in a second trial, once he has been found guilty of murder in the first degree and sentenced to life imprisonment. In *Littlejohn* both sides agreed that the reason that the post-trial motions were withdrawn was the fear that at a second trial Littlejohn might receive the death penalty. We there stated, 433 Pa. at 349: "A decision not to appeal because of such a fear cannot, as a matter of law, be a knowing and voluntary waiver of the right to appeal." We therefore granted Littlejohn an appeal nunc pro tunc. In *Archambault*, it was not clear on the record before us whether Archambault's failure to prosecute an appeal was the result of his lawyer's advice that such a procedure would be fruitless or the result of his fear of receiving the death penalty at a second trial. We therefore remanded the case for a hearing on the issue.

In the instant case, it is not clear whether Smith's failure to appeal resulted from his fear of receiving the death penalty on retrial, or from his lack of knowledge about his appeal rights. However, no hearing is necessary, for under either alternative, Smith did not knowingly and voluntarily waive his right to appeal. He is thus entitled to an appeal nunc pro tunc.

Moreover, since the parties have briefed both below and in this Court the issues which would be cognizable on a direct appeal, and since the issue with which we propose to deal involves solely a matter of law, we shall treat the instant proceeding as a direct appeal. See *Commonwealth v. Gist*, 433 Pa. 101, 249 A. 2d 351 (1969).

Appellant urges that he was denied due process by virtue of the trial court's charge that it was irrelevant who fired the fatal bullet. Such a charge was consistent with the dictum of this Court in *Commonwealth v. Moyer and Byron,* 357 Pa. 181, 53 A. 2d 736 (1947), and with the holding shortly thereafter in the appeal of appellant's cofelon, David Almeida, in *Commonwealth v. Almeida,* 362 Pa. 596, 68 A. 2d 595 (1949). In the latter case, by a stretch of the felony-murder rule, we held that Almeida could indeed be found guilty of murder even though the fatal bullet was fired by another officer acting in opposition to the felony. We adopted a proximate cause theory of murder: "[H]e whose felonious act is the *proximate* cause of another's death is *criminally* responsible for that death and must answer to society for it exactly as he who is *negligently* the *proximate cause* of another's death is civilly responsible for that death and must answer in damages for it." *Almeida,* 362 Pa. at pages 603-04 (emphasis in original). We thus affirmed Almeida's conviction, stating at page 607: "The felonious acts of the robbers in firing shots at the policemen, well knowing that their fire would be returned, as it should have been, was [sic] the proximate cause of Officer Ingling's death."

The proximate cause theory was taken a millimeter further by this Court in *Commonwealth v. Thomas,* 382 Pa. 639, 117 A. 2d 204 (1955). In that case the victim of an armed robbery shot and killed one of the felons, Jackson; the other felon, Thomas, was convicted of the murder.

*Thomas* was repudiated by this Court in *Commonwealth v. Redline,* 391 Pa. 486, 137 A. 2d 472 (1958). The facts there were virtually identical to those of *Thomas;* a policeman shot one fleeing felon and the other was convicted of murder. In an opinion by the late Chief Justice CHARLES ALVIN JONES, this Court interred *Thomas* and dealt a fatal blow to *Almeida.* At

the outset of this Court's opinion in *Redline,* we stated: "The decision in the Almeida case was a radical departure from common law criminal jurisprudence." The thorough documentation which followed in this lengthy opinion proved beyond a shadow of a doubt that *Almeida* and *Thomas* constituted aberrations in the annals of Anglo-American adjudicature.

*Redline* began with a rather general review of the entire felony-murder theory. If we may presume to elaborate a bit on that review, we should point out that the felony-murder rule really has two separate branches in Pennsylvania. The first, and the easier concept, is statutory. The Act of June 24, 1939, P. L. 872, §701, 18 P.S. §4701, provides, *inter alia*: "All murder which shall . . . be committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be murder in the first degree. All other kinds of murder shall be murder in the second degree." Clearly this statutory felony-murder rule merely serves to raise the degree of certain murders to first degree; it gives no aid to the determination of what constitutes murder in the first place. *Redline,* pointing out that except for one isolated situation[4] there is no statutory crime of murder, directed us to the common law for a determination of what constitutes murder. It is here that the other branch of the felony-murder rule, the common law branch, comes into play. Citing *Commonwealth v. Drum,* 58 Pa. 9 (1868), the early leading case on murder in the Commonwealth, and IV Blackstone, Commentaries, *198, *Redline* reaffirmed that the distinguishing criterion of murder is malice. The common law felony-murder rule is a means of imputing malice where it may not exist

---

[4] That situation is death-dealing by means of intentional train-wrecking. Act of June 24, 1939, P. L. 872, 18 P.S. §4919; see *Commonwealth v. Johnson,* 368 Pa. 139, 81 A. 2d 569 (1951).

expressly. Under this rule, the malice necessary to make a killing, even an accidental one, murder, is constructively inferred from the malice incident to the perpetration of the initial felony.

The common law felony-murder rule as thus explicated has been subjected to some harsh criticism, most of it thoroughly warranted. It has been said to be "highly punitive and objectionable as imposing the consequences of murder upon a death wholly unintended."[5] "An effect wholly unexpected and unconnected with the intention and act of the party, except by accident . . . [is] made the foundation of criminal responsibility."[6] *Redline* at page 494 related that "a widely accepted and quite plausible explanation of the origin of the doctrine is that at early common law many crimes, including practically all, if not all, felonies were punishable by death so that it was of no particular moment whether the condemned was hanged for the initial felony or for the death accidentally resulting from the felony." With a history like that it is hardly surprising that the rule has evoked bitter comment referring to it as "a holdover from the days of our barbarian Anglo-Saxon ancestors of pre-Norman days, [having] very little right to existence in modern society."[7]

A more temperate commentator suggests that the rule should be modified, so that a killing committed during the perpetration of a felony would create merely a *rebuttable* presumption of intention, rather than the *conclusive* presumption now created.[8] Other op-

---

[5] Pirsig, *Proposed Revision of the Minnesota Criminal Code*, 47 Minn. L. Rev. 417, 427-28 (1963).

[6] *Fourth Report of the Commissioners on Criminal Law* (1839) xxviii-xxix, quoted in Ludwig, *op. cit.*, 52.

[7] Mueller, *Criminal Law and Administration*, 34 N.Y.L. Rev. 83, 98 (1959).

[8] Crum, *Causal Relations and the Felony-Murder Rule*, 1952 Wash. U. Law Q., 191, 205.

ponents of the felony-murder rule point out that it is hardly an essential weapon in the Commonwealth's arsenal. Our neighboring state of Ohio has managed quite well without a felony-murder rule since abolishing it over a century ago. See *Robbins v. State*, 8 Ohio St. 131 (1857).

In fact, not only is the felony-murder rule nonessential, but it is very doubtful that it has the deterrent effect its proponents assert.[9] On the contrary, it appears that juries rebel against convictions, adopting a homemade rule against fortuities, where a conviction must result in life imprisonment.[10] If added deterrence is desired, the felony-murder rule is not the right approach. The situation was well-analyzed many years ago: "To punish as a murderer, every man who, while committing a heinous offence, causes death by pure mis adventure, is a course which evidently adds nothing to the security of human life. . . . The only good effect which such punishment can produce will be to deter people from committing any of these offences which turn into murders what are in themselves mere accidents. It is in fact an addition made in the very worst way. . . . If the punishment for stealing from the

---

[9] See, e.g., the dissenting opinion of Justice (now Chief Justice) BELL in *Commonwealth v. Redline*, supra, where he stated: "The brutal crime wave which is sweeping and appalling our Country can be halted only if the Courts stop coddling, and stop freeing murderers, communists and criminals on technicalities made of straw." To similar effect is the statement in *Commonwealth v. Kelly*, 333 Pa. 280, 287, 4 A. 2d 805 (1939) : "To this Commonwealth one must answer as a malicious criminal for any fatal injury he here causes a human being by anything done by him intentionally or uintentionally during the commission or attempted commission of any of the specified felonies, for malice is the mainspring of his outlawed enterprise and his every act within the latter's ambit is imputable to that base quality. *Such a rule is essential to the protection of human life.*" (Emphasis added).

[10] See Ludwig, *op. cit.*, 62.

person be too light, let it be increased, and let the increase fall alike on all the offenders! Surely the worst mode of increasing the punishment of an offence is to provide that, besides the ordinary punishment, every offender shall run any exceedingly small risk of being hanged."[11] To similar effect, Justice OLIVER WENDELL HOLMES, in *The Common Law,* argued that the wise policy is not to punish the fortuity, but rather to impose severe penalties on those types of criminal activity which experience has demonstrated carry a high degree of risk to human life.[12] In this respect, we note the recent amendment to The Penal Code, providing for increased penalties when certain crimes are committed with firearms.[13]

We have gone into this lengthy discussion of the felony-murder rule not for the purpose of hereby abolishing it. That is hardly necessary in the instant case. But we do want to make clear how shaky are the basic premises on which it rests. With so weak a foundation, it behooves us not to extend it further and indeed, to restrain it within the bounds it has always known. As stated above, *Redline,* at page 495 et seq., demolished the extension to the felony-murder rule made in *Almeida*: "In adjudging a felony-murder, it is to be remembered at all times that the thing which is imputed

---

[11] *Commissioners on Criminal Law, Second Report* 17 (1846), quoted in 1 Russell, *Crime* 563 (10th ed. 1950) and Morris, *op. cit.,* n.3, at 68.

[12] Holmes, *The Common Law* 59 (1881).

[13] Act No. 227 of 1968, approved July 30, 1968. It provides, inter alia: "Whoever is convicted of committing a crime of violence, which for the purposes of this section means murder, rape, robbery, burglary, entering a building with intent to commit a crime therein, kidnapping or participation in riot and during the commission thereof had in his possession a firearm shall, in addition to the penalties prescribed by law, be sentenced to undergo imprisonment for not less than five (5) years and not more than ten (10) years."

to a felon for a killing incidental to his felony is *malice* and *not the act of killing.* . . . 'The malice of the *initial* offense attaches to whatever else the *criminal* may do in connection therewith.' . . . And so, until the decision of this court in Commonwealth v. Almeida, supra, in 1949, the rule which was uniformly followed, whether by express statement or by implication, was that in order to convict for felony-murder, *the killing must have been done by the defendant or by an accomplice or confederate or by one acting in furtherance of the felonious undertaking.* [citing a long line of cases].

"Until the Almeida case there was no reported instance in this State of a jury ever having been instructed on the trial of an indictment for murder for a killing occurring contemporaneously with the perpetration of a felony that the defendant was guilty of murder regardless of the fact that the fatal shot was fired by a third person acting in hostility and resistance to the felon and in deliberate opposition to the success of the felon's criminal undertaking." (Emphasis in original).

*Redline* proceeded to discuss the cases, both within and without Pennsylvania, which establish the rule that murder is not present where the fatal shot is fired by a third person acting in opposition to the felon. See *Commonwealth v. Thompson,* 321 Pa. 327, 330, 184 Atl. 97 (1936); *Commonwealth v. Mellor,* 294 Pa. 339, 342, 144 Atl. 534 (1928); *Commonwealth v. Campbell,* 89 Mass. (7 Allen) 541 (1863); *Butler v. People,* 125 Ill. 641, 18 N.E. 338 (1888); *Commonwealth v. Moore,* 121 Ky. 97, 88 S.W. 1085 (1905); *State v. Oxendine,* 187 N.C. 658, 122 S.E. 568 (1924). See also *People v. Udwin,* 254 N.Y. 255, 172 N.E. 489 (1930); *People v. Garippo,* 292 Ill. 293, 127 N.E. 75 (1920). We see no reason to repeat that discussion, and simply refer the reader to *Redline,* 497 to 503. The Court then summarized the rule by quoting, at pages 503-04, from 13 Ruling Case Law at pp. 753-754: " 'Thus, where persons

conspire together to commit robbery, and while carrying out such conspiracy their victim, in self-defense, discharges a fire arm at his assailants, and accidentally kills a bystander, the conspirators are not guilty of the homicide.' "

We then proceeded to distinguish the cases relied upon in *Almeida*. Chief among those cases was *Commonwealth v. Moyer and Byron,* supra. We referred to the statement in that case to the effect that a felon can be convicted of murder if the shot is fired by the intended victim as "a palpable gratuity," since the court below had charged that the defendant was entitled to an acquittal unless the Commonwealth proved beyond a reasonable doubt that one of the felons had fired the fatal bullet. We further distinguished the cases, cited in *Almeida,* in which the death-dealing act was committed by one participating in the initial felony. See *Commonwealth v. Guida,* 341 Pa. 305, 19 A. 2d 98 (1941) ; *Commonwealth v. Doris,* 287 Pa. 547, 135 Atl. 313 (1926) ; and *Commonwealth v. Sterling,* 314 Pa. 76, 170 Atl. 258 (1934). A similar factual difference was noted in the cases succeeding *Almeida* and relied upon by the Commonwealth, *Commonwealth v. Phillips,* 372 Pa. 223, 93 A. 2d 455 (1953) and *Commonwealth v. Lowry,* 374 Pa. 594, 98 A. 2d 733 (1953).

Finally, we distinguished the *express* malice cases. These included the so-called "shield" cases, where a felon used the interposition of the body of an innocent person to escape harm in flight from the scene of the crime. See, e.g., *Keaton v. State,* 41 Tex. Cr. R. 621, 57 S.W. 1125 (1900) ; *Taylor v. State,* 41 Tex. Cr. R. 564, 55 S.W. 961 (1900) ; and *Wilson v. State,* 68 S.W. 2d 100 (Ark. 1934). These cases were not based on the felony-murder rule and imputed malice, but on the express malice found in the use of an innocent person as a shield or breastwork against hostile bullets. *Redline* also indicated that *Commonwealth v. Bolish,* 381

Pa. 500, 113 A. 2d 464 (1955), heavily relied upon by the dissent in that case, may have been a case of express malice. *Bolish* was described in *Redline,* at page 508, as follows: "Bolish was indicted for murder of his confederate, Flynn, who died from severe burns received while committing arson with the use of an inflammable liquid and an electric hot plate furnished by Bolish for use in setting the fire of the criminal undertaking. Under the evidence, Flynn was either (1) an accomplice of Bolish who allegedly had planned the arson or (2) he was Bolish's weak-minded tool who acted under the impulse of Bolish's influence and domination. Thus, the malice essential to charging Bolish with murder was present either (1) *by imputation* under the felony-murder theory, if the death was found by the jury to have occurred as a result of confederate Flynn's act in furtherance of the criminal conspiracy or (2) *expressly,* if Flynn was found to be merely a pliant dupe who acted on Bolish's order in performing the criminal act with highly dangerous means which threatened grievous bodily harm to the actor." (Emphasis in original). The first theory seems to be that taken by the majority in *Commonwealth v. Bolish,* decided on the same day that *Redline* was decided, 391 Pa. 550, 138 A. 2d 447 (1958), which affirmed Bolish's second conviction after the first had been reversed for trial errors. The Court pointed out, at page 553, that Bolish was actively participating in the arson, and therefore his cofelon's act was imputed to him. "The fact that the victim was an accomplice does not alter the situation, since the act which caused his death was in furtherance of the felony."

This lengthy review of *Redline* should have made it clear that the cases on which *Almeida* was based did not support the result reached therein, nor do the later cases. However, *Redline* was not limited merely to a factual explication of the cases on which *Almeida* re-

lied. *Redline,* at page 505, rejected the proximate cause tort analogy which *Almeida* found so appealing: "As we have already seen, the 'causation' requirement for responsibility in a felony-murder is that the homicide stem from the commission of the felony. Obviously, the assumed analogy between that concept and the tort-liability requirement of proximate cause is not conclusive. If it were, then the doctrine of supervening cause, which, for centuries, courts have recognized and rendered operative on questions of proximate cause, would have to be considered and passed upon by the jury. But, that qualification, the Almeida case entirely disregarded."

The issue of the application of tort proximate cause principles to homicide prosecutions again arose a few years after *Redline* in *Commonwealth v. Root,* 403 Pa. 571, 170 A. 2d 310 (1961). In that case the defendant was engaged in a drag race on a public highway with another person who swerved to the left side of the road, crashed head-on into an oncoming truck, and was killed. This Court reversed Root's conviction for involuntary manslaughter, and rejected utterly the tort concept of proximate cause in criminal homicide prosecutions:

"While precedent is to be found for application of the tort law concept of 'proximate cause' in fixing responsibility for criminal homicide, the want of any rational basis for its use in determining criminal liability can no longer be properly disregarded. When proximate cause was first borrowed from the field of tort law and applied to homicide prosecutions in Pennsylvania, the concept connoted a much more direct causal relation in producing the alleged culpable result than it does today. Proximate cause, as an essential element of a tort founded in negligence, has undergone in recent times, and is still undergoing, a marked extension. More specifically, this area of civil law has

been progressively liberalized in favor of claims for damages for personal injuries to which careless conduct of others can in some way be associated. To persist in applying the tort liability concept of proximate cause to prosecutions for criminal homicide after the marked expansion of *civil* liability of defendants in tort actions for negligence would be to extend possible *criminal* liability to persons chargeable with unlawful or reckless conduct in circumstances not generally considered to present the likelihood of a resultant death.

"In this very case (Commonwealth v. Root, 191 Pa. Superior Ct. 238, 245, 156 A. 2d 895) the Superior Court mistakenly opined that 'The concept of proximate cause as applied in tort cases is applicable to similar problems of causation in criminal cases. Commonwealth v. Almeida, 362 Pa. 596, 603, 611, 68 A. 2d 595 (1949).' It is indeed strange that the Almeida case should have been cited as authority for the above quoted statement; the rationale of the Almeida case was flatly rejected by this Court in Commonwealth v. Redline, 391 Pa. 486, 504-505, 137 A. 2d 472 (1958), where we held that the tort liability concept of proximate cause is not a proper criterion of causation in a criminal homicide case." (Emphasis in original).

Such an approach has met with approval from the commentators: "It seems preferable, however, to impose liability only for homicides resulting from acts done in furtherance of the felony. A closer causal connection between the felony and the killing than the proximate-cause theory normally applicable to tort cases should be required because of the extreme penalty attaching to a conviction for felony murder and the difference between the underlying rationales of criminal and tort law. The former is intended to impose punishment in appropriate cases while the latter is primarily concerned with who shall bear the burden of a loss. Requiring this closer causal connection, although

it precludes the imputation of the act of killing under the felony-murder rule, would not relieve a felon from responsibility for homicides committed by a cofelon since one member of a conspiracy is responsible for the acts of his coconspirators committed in furtherance of the object of the conspiracy."[14]

After this review of *Redline,* the uninitiated might be surprised to learn that *Redline* did not specifically overrule *Almeida.*[15] This Court did overrule *Thomas,* holding that no conviction was possible for a *justifiable* homicide, where a policeman shot a felon, but "distinguished" *Almeida* on the ground that the homicide there, where an innocent third party was killed by a policeman, was only *excusable.* This distinction was rather remarkable in view of the cases relied upon by the Court—almost all cases in which the victim was an innocent third party rather than a felon. See, e.g., *Commonwealth v. Thompson,* supra; *Commonwealth v. Mellor,* supra; *Butler v. People,* supra; and *State v. Oxendine,* supra. The Dissenting Opinion in *Redline* observed that the majority, in order to reverse Redline's conviction had "to *expressly* overrule . . . Commonwealth v. Almeida . . . [and] . . . repudiate all the basic reasons and fundamental principles upon which this Court's prior felony murder decisions were predicated in . . . Commonwealth v. Almeida . . ." (Emphasis in original). We have already quoted from the opinion of this Court in *Commonwealth v. Root,* supra, where the writer of the majority opinion in *Redline* wrote for the Court that "the rationale of the Almeida case was flatly rejected by this Court in Commonwealth v. Redline . . ."

In fact, even the majority in *Redline* seemed to realize that they were seizing upon a will-of-the-wisp

---

[14] 71 Harv. L. Rev., *op. cit.,* 1565.

[15] Justice COHEN in his Concurring Opinion in *Redline* did state that he would overrule *Almeida.*

in attempting to refrain from *then* overruling *Almeida:* "It is, of course, true that the distinction thus drawn between Almeida and the instant case on the basis of the difference in the character of the victims of the homicide is more incidental than legally significant so far as relevancy to the felony-murder rule is concerned: . . . In other words, if a felon can be held for murder for a killing occurring during the course of a felony, even though the death was not inflicted by one of the felons but by someone acting in hostility to them, it should make no difference to the crime of murder who the victim of the homicide happened to be." *Redline,* at pages 509-10.

The "distinction" *Redline* half-heartedly tries to draw has not escaped criticism from the commentators. While the result reached in *Redline* and most of its reasoning have met with almost unanimous approval, the *deus ex machina* ending has been condemned. One learned journal has commented:

"It seems, however, that Almeida cannot validly be distinguished from [Redline]. The probability that a felon will be killed seems at least as great as the probability that the victim will be an innocent bystander. Any distinction based on the fact that the killing of a felon by a policeman is sanctioned by the law and therefore justifiable, while the killing of an innocent bystander is merely excusable, seems unwarranted. No criminal sanctions now attach to either in other areas of criminal law, and any distinction here would seem anomalous. Indeed, to make the result hinge on the character of the victim is, in many instances, to make it hinge on the marksmanship of resisters. Any attempt to distinguish between the cases on the theory that the cofelon assumes the risk of being killed would also be improper since this tort doctrine has no place in the criminal law in which the wrong to be redressed is a public one—a killing with the victim's consent is

nevertheless murder. It is very doubtful that public desire for vengeance should alone justify a conviction of felony murder for the death of an innocent bystander when no criminal responsibility will attach for the death of a cofelon."[16]

*Redline* concluded, at page 510, in this manner: "The limitation which we thus place on the decision in the Almeida case renders unnecessary any present reconsideration of the extended holding in that case. It will be time enough for action in such regard if and when a conviction for murder based on facts similar to those presented by the Almeida case (both as to the performer of the lethal act and the status of its victim) should again come before this court." The time is now. The facts are not merely similar to those of *Almeida;* they are identical, Smith and Almeida being cofelons. The case law of centuries and the force of reason, both dealt with in great detail in *Redline* and above, require us to overrule *Almeida*.

Nor are we prevented from so doing in this case by our decisions in *Com. ex rel. Hough v. Maroney,* 402 Pa. 371, 167 A. 2d 303 (1961), cert denied, 366 U.S. 971 (1961); *Com. ex rel. Almeida v. Rundle,* 409 Pa. 460, 187 A. 2d 266 (1963); and *Com. ex rel. Hough v. Maroney,* 425 Pa. 411, 229 A. 2d 913 (1967). All of those were *habeas corpus* proceedings, in which Smith's cofelons sought release by virtue of the change in law that had occurred since their convictions had become final, asking us to give retroactive effect to *Redline.* In *Hough* (402 Pa. at 375-76) we stated: "The basic fallacy of the appellant's contention lies in the fact that the felony-murder rule laid down in the Redline case, supra, which is now the law of Pennsylvania, was not enunciated until 1958, more than ten years after the ap-

---

[16] 71 Harv. L. Rev. *op. cit.,* 1566-67; See, to similar effect, 106 U. Pa. L. Rev., *op. cit.,* 1178.

pellant's conviction and sentence. Under the felony-murder rule as it existed in this State at the time of the appellant's plea of guilty to a charge of murder generally, his conviction of murder in the first degree and his ensuing sentence to death, who fired the fatal shot was irrelevant to the guilt of the felonious conspirator so long as it was fired in aid of or in resistance to the perpetration of the felony." Similarly, in *Almeida* (409 Pa. at 462) we said: "The legality of the appellant's conviction is and must be governed by the law of Pennsylvania as it existed at the time of said conviction." We most recently reaffirmed this view in *Hough* (425 Pa.).

All three of those cases, however, were collateral attacks on the convictions. By contrast, the instant case is now on *direct appeal*. Although in the three collateral attack cases, we spoke of the law as it existed at the time of the relator's "conviction", we were not at that time faced with a situation where the conviction had not yet become final, as here. Hough's conviction had become final as a result of his appeal, and Almeida's became final by virtue of his failure to take an appeal. In contrast, here, Smith's conviction is not final, as he is on direct appeal. No one would suggest that this Court would be violating any settled principles of law by making a change in the law and reversing a conviction, even though the law at the time of conviction supported the conviction. This has occurred innumerable times, in practically every landmark constitutional criminal case. Nor should the result be any different where the appeal is nunc pro tunc rather than immediately after conviction. In *Commonwealth v. Little*, 432 Pa. 256, 248 A. 2d 32 (1968), we conclusively rejected the suggestion made in the late Justice MUSMANNO'S opinion in *Commonwealth v. Jefferson*, 430 Pa. 532, 243 A. 2d 412 (1968), that in a *nunc pro tunc* appeal the appellant is entitled only to those

rights which he would had if the appeal had been timely filed. See, also, *Commonwealth v. Gist,* supra. We pointed out that such an approach would lead the Court into a dreadful factual morass in attempting to speculate as to the length of time an appeal would have taken if it had been filed and perfected immediately upon conviction. *Little* involved a right conferred by the decisions of the United States Supreme Court, the proscription against tacit admissions, deriving from *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966) and *Malloy v. Hogan,* 378 U.S. 1, 84 S. Ct. 1489 (1964). Where the right involved is one conferred by the decisions of this Court, the factual morass would become even worse, as this Court would be forced to speculate what it might have done when it might have come up on appeal. Clearly, we would be approaching Peter Pan's Never-Never Land. More important even than the factual morass involved, however, is that we would simply not be according an appellant a true right of appeal, for this Court would never have had the actual opportunity of passing on the issues he raised.

Appellant is therefore in no way precluded from asserting his claim that *Almeida* should be overruled. We thus give *Almeida* burial, taking it out of its limbo, and plunging it downward into the bowels of the earth.[17]

The order of the court below is reversed, an appeal is allowed *nunc pro tunc,* and a new trial is granted.

Mr. Justice EAGEN concurs in the result.

---

[17] See fn.* p. 548 of the Dissenting Opinion in *Redline,* where Justice (now Chief Justice) BELL laments: "In the majority opinion, Commonwealth v. Almeida, like Mohammed's coffin, is suspended between Heaven and earth. However, unlike Mohammed's coffin, which is headed upward toward Heaven, the coffin containing Commonwealth v. Almeida is pointed downward in preparation for a speedy flight into the bowels of the earth."

238

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

This is the age of Crime and Criminals, and the peace-loving citizen is the forgotten man. Murder, robbery and rape are rampant, and this tidal wave of ruthless crime, violence and widespread lawlessness* which too often goes unpunished is due in considerable part to recent pro-criminal decisions of the highest Courts in our State and Country. No matter how guilty a convicted criminal undoubtedly is, no matter how terrible his crime was, or how many crimes he has previously committed, the highest Courts of our Country (1) have in recent years extended and continue to *expand* the so-called rights of criminals, and (2) are completely oblivious of the rights, the security, the safety and the welfare of the law-abiding public. Even worse, if possible, is the fact that the highest Federal and State Courts are frequently making *retroactive* their *newly created* and *expanded* rights of guilty criminals, with the result that dangerous criminals who have been in jail for a dozen or a score or more of years are released or granted new trials which, in practical effect (because of the length of time and the inability to find trial witnesses, or their faded recollections), is the equivalent of release. Judges too often forget that Justice is not a one-way street—one way for the criminal only—Justice is a two-way street where the rights and protection of the law-abiding people should be at least equal to those of the criminal.

This alarming crime wave which is inundating our Nation and in our large cities terrifying our people,

---

* So widespread has lawlessness become that gangs terrorize with impunity parts of large cities, and rioting, vandalism, forcible seizure of buildings and college campuses and even seizure and desecration of churches, too often go unpunished, due to the timidity of public officials or heads of seized or vandalized properties, or the mollycoddling attitude and the ultra-lenient sentences of many lower Court Judges.

can only be halted or curtailed by speedier Court trials and by swifter and more commensurate punishment of every man, woman and juvenile who breaks, or aids another in breaking, the law. In this era of turmoil, rioting, violence and widespread ruthless crime, which has become a daily occurrence in our Cities, States and Nation, a commensurate sentence means a *severe* sentence which will not only fit the particular crime and the particular criminal, but *will act as a powerful deterrent to "prospective" criminals and to "repeating" criminals.*

## The Majority's Holding

In a pro-criminal Opinion which is so disastrous to the safety and protection of Society, this Court has drastically changed and made a shambles of the felony-murder doctrine. For the second time the Court has repudiated our previously well-settled felony-murder law and the basic reasons and the fundamental principles upon which this Court's prior felony-murder decisions were predicated; and they have overruled, without the slightest legal or moral justification, many recent decisions of this Court which were rendered at a time when the Supreme Court of Pennsylvania was considered to be one of the two or three best Courts in our Country.

The Majority specifically hold that if a killing occurs during the commission or attempted perpetration of a robbery or other major felony, or during the attempted escape of one of the robbers or any of the dangerous cofelons, none of the robbers and *none of the cofelons is guilty of murder—if the fatal shot was fired by the holdup victim or by a policeman* or other law enforcement officer, or by a person attempting to prevent the robbery or the robber's (or felon's) escape, *or by anyone except one of the robbers or a cofelon.* This

decision, which is so disastrous to Society, is reached by unrealistic, and at times far-fetched reasoning, which together with its predecessor, *Commonwealth v. Redline*, 391 Pa. 486, 137 A. 2d 472, which it expands, will produce the most harmful damage to law-abiding citizens ever inflicted sua sponte* by the Supreme Court of Pennsylvania.

Worse still, the Majority make their decision in this case retroactive and apply it to a criminal who was justly convicted of murder twenty-three years ago.

### The Prior Law and Its Rationale

For ages, it has been the well-settled and wisely-established law that when a person intentionally commits or joins or conspires with another to commit a felonious act, or sets or joins another in setting in motion a chain of circumstances the natural and probable or reasonably foreseeable result of which will be death or serious bodily harm to some person, he and his cofelons are guilty of the crime which was a product or result of the aforesaid criminal act or chain of circumstances. If the felon or cofelons possessed legal malice,** and death resulted, all the felons who participated in the felonious act or in the aforesaid chain of circumstances would be guilty of murder.

In the leading cases of *Commonwealth v. Moyer* and *Commonwealth v. Byron*, 357 Pa. 181, 53 A. 2d 736, the Court unanimously held that every person who committed or attempted to commit a felony such as robbery, or feloniously participated therein, was guilty of

---

* Not required by a decision of the Supreme Court of the United States.

** Legal malice is defined in *Commonwealth v. Chermansky*, 430 Pa. 170, 242 A. 2d 237; *Commonwealth v. Lawrence*, 428 Pa. 188, 236 A. 2d 768; *Commonwealth v. Carroll*, 412 Pa. 525, 194 A. 2d 911; *Commonwealth v. Gooslin*, 410 Pa. 285, 189 A. 2d 157.

murder in the first degree, even though the fatal bullet was fired by the intended victim in repelling the robbery. Chief Justice MAXEY, speaking for a unanimous Court, relevantly and wisely said (pages 190-191):

"The doctrine that when malice is the mainspring of a criminal act the actor will be held responsible for any consequence of his act though it was not the one intended was recognized centuries ago when it was held that, quoting from Blackstone, Book IV, page 1599, section 201, 'if one shoots at A and misses him, but kills B, this is murder, because of the previous felonious intent, *which the law transfers from one to the other.*' (Italics supplied). It is equally consistent with reason and sound public policy to hold that when a felon's attempt to commit robbery or burglary sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act. For any individual forcibly to defend himself or his family or his property from criminal aggression is a primal human instinct. It is the right and duty of both individuals and nations to meet criminal aggression with effective countermeasures. Every robber or burglar knows when he attempts to commit his crime that he is inviting dangerous resistance. Any robber or burglar who carries deadly weapons (as most of them do and as these robbers did) thereby reveals that he expects to meet and overcome forcible opposition. . . . *Every robber or burglar knows that a likely later act in the chain of events he inaugurates will be the use of deadly force against him on the part of the selected victim. For whatever results follow from that natural and legal use of retaliating force, the felon must be held responsible.**** For

---

* Italics throughout ours, unless otherwise indicated.

Earl Shank, the proprietor of a gas station in Ridley Township, Delaware County, which at 11 P.M. on July 13, 1946, was being attacked by armed robbers, to return the fire of these robbers with a pistol which he had at hand was as proper and as inevitable as it was for the American forces at Pearl Harbor on the morning of December 7, 1941, to return the fire of the Japanese invaders. The Japanese felonious invasion of the Hawaiian Islands on that date was in law and morals the proximate cause of all the resultant fatalities. The Moyer-Byron felonious invasion of the Shank gas station on July 13, 1946, was likewise the proximate cause of the resultant fatality."

In *Commonwealth v. Almeida,* 362 Pa. 596, 68 A. 2d 595, the Court (with one concurring Opinion and one dissent) once again reiterated the application of the felony-murder rule in a case where an off-duty patrolman was killed by a bystander in a gun battle with the robbers, and every robber was held to be guilty of murder even though the fatal shot was fired by a bystander. The Court, in an Opinion by Chief Justice MAXEY, said (pages 601, 602, 603, 604, 605):

"In his charge the trial judge said: 'If that [fatal] shot were fired by anyone, even anyone removed from these three participants, and that shot was fired in the perpetration of a robbery, members of the jury, that is murder; that is murder in the first degree. . . . If one or more persons set in motion a chain of circumstances out of which death ensues, those persons must be held responsible for any death which by direct, by almost inevitable sequence, results from such unusual criminal act. . . . So, if the death of Officer Ingling was the inevitable consequence of the unlawful act, or acts, of the defendant, or the continuation of the unlawful act, or acts, of the defendant, acting in concert—for every one who does an unlawful act is considered by the law as the doer of all that follows—if that unlawful act

be robbery, and if the result of that act is a killing, members of the jury, that killing is murder.'

"The defendant's thirteenth point for charge which the trial judge correctly rejected was in effect a request that the court instruct the jury that in order to convict the defendant of the death of Officer Ingling, the jury would have to find that the fatal shot was fired by one of the three robbers. Such an instruction would have been in defiance of this Court's decision in Commonwealth v. Moyer and Commonwealth v. Byron, 357 Pa. 181, 53 A. 2d 736, which decision the trial judge dutifully followed. . . . 'A man or men engaged in the commission of such a felony as robbery can be convicted of murder in the first degree if the bullet which causes death was fired not by the felon but by the intended victim in repelling the aggressions of the felon or felons. . . . when a felon's attempt to commit robbery or burglary sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act. For any individual forcibly to defend himself or his family or his property from criminal aggression is a primal human instinct. It is the right and duty of both individuals and nations to meet criminal aggression with effective countermeasures. Every robber or burglar knows when he attempts to commit his crime that he is inviting dangerous resistance. . . .'

". . . This Court in Commonwealth v. Doris, 287 Pa. 547, 135 A. 313, held that a conviction of murder of the first degree was proper, although it appeared that, after a robbery had been completed and the conspirators were trying to effect their escape, an accomplice of the defendant shot and killed the deceased.

"The *factual* issue the defendant raises in this case is identical with the factual issue raised by the defendants in Commonwealth v. Moyer and Byron, supra; to

wit, who fired the fatal bullet—one of the robbers or a man who was lawfully resisting the criminal attack of the robbers? The *legal* question presented and decided in the Moyer-Byron cases was precisely the legal question raised in the instant case; to wit, when men who are feloniously shot at by robbers return their fire in self-defense and a third person is killed by a shot fired by the defenders, are the robbers whose felonious action caused the shooting guilty of murder? In the Moyer-Byron cases this Court after a thorough discussion of that question decided that under the facts of that case, 'The Moyer-Byron felonious invasion of the Shank gas station on July 13, 1946, was likewise the proximate cause of the resultant fatality.' (191 of 357 Pa.) That was not dictum but authority. 'Whenever a question fairly arises in the course of a trial, and there is a distinct decision thereon, the court's ruling in respect thereto can in no sense be regarded as mere "dictum".' New York Cent. & H. R.R. Co. v. Price, 159 F. 330, 332, 86 C.C.A. 502, 16 L.R.A., N.S., 1103. See also Schuetz's Estate, 315 Pa. 105, 172 A. 865. Our decision in Commonwealth v. Moyer and Byron, supra, is authority for our decision in this case.

"Our decision in the Moyer-Byron case was an application of the long established principle that he whose felonious act is the *proximate* cause of another's death is *criminally* responsible for that death and must answer to society for it exactly as he who is *negligently* the *proximate cause* of another's death is *civilly* responsible for that death and must answer in damages for it. Wharton on Homicide, Third Edition, p. 30, says under the heading of 'Causal Connections' that: '. . . one whose wrongful act hastens or accelerates the death of another, or contributes to its cause, is guilty of homicide, though other causes co-operate. . . .'

. . .

"Justice HOLMES in his book on 'The Common Law,' (36th Ed.) pp. 56 and 57, [appropriately] said: Acts

should be judged by *their tendency under the known circumstances,* not by the actual intent which accompanies them. . . . 'the object of the law is to prevent human life being endangered or taken. . . . the law requires [men] at their peril to know the teachings of common experience, just as it requires them to know the law. . . . the test of murder is the degree of danger to life attending the act under the known circumstances of the case.' "*

In *Commonwealth v. Lowry,* 374 Pa. 594, 98 A. 2d 733, we held that the driver of the alleged get-away car was guilty of first-degree murder, and in an unanimous Opinion said (pages 599-600) : "Where a killing occurs in the course of a robbery, all who participate in the robbery including the driver of the get-away car are equally guilty of murder in the first degree even though some one other than the defendant fired the fatal shot.   Com. v. Robb, 284 Pa. 99, 130 A. 302; Com. v. Moyer and Com. v. Byron, 357 Pa. 181, 53 A. 2d 736; Com. v. Hough, 358 Pa. 247, 56 A. 2d 84; Com. v. Almeida, 362 Pa. 596, 68 A. 2d 595; Com. v. Thomas, 357 Pa. 68, 53 A. 2d 112; Blackstone, Book 4, pages 192, 193.

. . .

"In Com. v. Robb, 284 Pa. 99, 130 A. 302, the defendant was indicted and convicted of murder.   He was a lookout and had nothing to do with the burglary or the murder.   The Court said: 'If defendants "combine to commit a felony or make an assault, and, in carrying out the common purpose, another is killed, the one who enters into the combination but does not personally commit the wrongful act is equally responsible for the homicide with the one who directly causes it" : Com. v. Micuso, 273 Pa. 474, 478.   "It is not necessary, however, to prove that the party actually aided

---

* Italics in *Commonwealth v. Almeida* **Opinion.**

in the commission of the offense; if he watched for his companions, in order to prevent surprise, or remained at a convenient distance in order to favor their escape, if necessary, or was in such a situation as to be able readily to come to their assistance, the knowledge of which was calculated to give additional confidence to his companions, in contemplation of law he was aiding and abetting": Weston v. Com., 111 Pa. 251, 263; Com. v. Biddle, [200 Pa. 640].' "

In *Commonwealth v. Bolish*, 381 Pa. 500, 113 A. 2d 464, this Court said (page 520) : "We may thus summarize what has become the settled law of Pennsylvania: If a person with legal malice commits an act or sets off a chain of events from which, in the common experience of mankind, the death of another is a natural or reasonably foreseeable result, that person is guilty of murder, if death results from that act or from the events which it naturally produced. If the original malicious act was arson, rape, robbery, burglary or kidnapping, the original actor is guilty of murder in the first degree."

In *Commonwealth v. Thomas*, 382 Pa. 639, 117 A. 2d 204, the Court held that when one of two robbers running from a store which they had just robbed is killed by the hold-up victim, both robbers are guilty of murder in the first degree. In this case, the Court reaffirmed *Commonwealth v. Almeida*, 362 Pa., supra; *Commonwealth v. Moyer*, 357 Pa., supra; *Commonwealth v. Lowry*, 374 Pa., supra; *Commonwealth v. Bolish*, 381 Pa., supra; *Commonwealth v. Doris*, 287 Pa. 547, 135 Atl. 313; *Commonwealth v. Guida*, 341 Pa. 305, 19 A. 2d 98; and *Commonwealth v. Sterling*, 314 Pa. 76, 170 Atl. 258. The Court quoted at some length from several of the above-mentioned cases, and pertinently said (page 642) :

"If the defendant sets in motion the physical power of another, he is liable for its result. 'Acts should be

judged by *their tendency under the known circumstances,* not by the actual intent which accompanies them . . . the law requires [men] at their peril to know the teachings of common experience, just as it requires them to know the law . . . "the test of murder is the degree of danger to life attending the act under the known circumstances of the case" ' . . . ' "He whose act causes in any way, directly or indirectly, the death of another, kills him, within the meaning of the law of felonious homicide. It is a rule both of reason and the law that whenever one's will *contributes to impel a physical force, whether another's, his own, or a combined force, proceeding from whatever different sources, he is responsible for the result, the same as though his hand, unaided, had produced it . . ."* ' 'There can be no doubt about the "justice" of holding that felon guilty of murder in the first degree who engages in a robbery or burglary and thereby inevitably calls into action defensive forces against him, the activity of which forces result in the death of a human being': . . . ."*

The Court further said (pages 644-645) : "That the victim, or any third person such as an officer, would attempt to prevent the robbery or to prevent the escape of the felons, and would shoot and kill one of the felons was 'as readily foreseeable' as the cases where an innocent bystander is killed, even unintentionally, by the defendant's accomplice, or where the victim of the robbery is slain, or where a pursuing officer is killed. The killing of the co-felon is the natural foreseeable result of the initial act. The robbery was the proximate cause of the death. We can see no sound reason for distinction merely because the one killed was a co-felon. It was a killing in the perpetration of a robbery which was 'unquestionably contemplated and

---

\* Italics in *Commonwealth v. Thomas* Opinion.

callously ignored by the defendant, who most certainly intended to commit a crime which he knew might well give rise to it': Commonwealth v. Sterling, 314 Pa. 76, 80, 170 A. 258."

Mr. Justice CARDOZO, in "The Nature of the Judicial Process," pages 66 and 67, wisely said: "When they [judges] are called upon to say how far existing rules are to be extended or restricted, *they must let the welfare of society fix the path, its direction and its distance . . . The final cause of law is the welfare of society . . .*"

Blackstone, IV Blackstone Commentaries, said, §197, page 1594: "If a man, however, does such an act of which the probable consequence may be, and eventually is, death; such killing may be murder, although no stroke be struck by himself and no killing be primarily intended: . . ."

All of the aforesaid cases were actually or in practical effect overruled when there was a change of personnel in the Supreme Court of Pennsylvania, at which time they ignored all the reasoning and the principles and the prior decisions of this Court and changed the law in and by *Commonwealth v. Redline,* 391 Pa. 486, 137 A. 2d 472. I believe that this was the most unrealistic, the most unwise, and the most damaging blow to the protection and safety of Society ever heretofore delivered by the Supreme Court of Pennsylvania.

For all of the reasons hereinabove mentioned, I very vigorously dissent.

The decision of the Majority giving Smith a new trial—Smith never took any kind of appeal or any post-conviction petition until the present appeal—is inexcusably unfair and unjust to Almeida and Hough, whose repeated petitions for a new trial and their appeals from the judgment of sentence of murder were rejected and dismissed by this Court, and also by Federal Courts. See *Commonwealth ex rel. Hough v. Ma-*

*roney,* 425 Pa. 411, 229 A. 2d 913; *Commonwealth ex rel. Almeida v. Rundle,* 409 Pa. 460, 187 A. 2d 266, cert. den. 374 U.S. 815; *Commonwealth ex rel. Hough v. Maroney,* 402 Pa. 371, 167 A. 2d 303, cert. den. 366 U.S. 971; *Commonwealth ex rel. Almeida v. Baldi,* 361 Misc. Docket No. 9 (1950), cert. den. 340 U.S. 867; *Commonwealth v. Almeida,* 362 Pa. 596, 68 A. 2d 595; *Commonwealth v. Hough,* 358 Pa. 247, 56 A. 2d 84; *United States ex rel. Hough v. Maroney,* 247 F. Supp. 767 (W.D. Pa.); *United States ex rel. Almeida v. Baldi,* 104 F. Supp. 321 (E.D. Pa.), aff'd 195 F. 2d 815, cert. den. 345 U.S. 904, rehearing den. 345 U.S. 946.

It has often been said that "Justice is blind," meaning thereby that Justice is absolutely fair to everyone, and is not subject to any outside or improper influence whatsoever. In this case, Justice is certainly blind, but it is a new and different social and legal blindness; and what it erroneously terms "Justice" is "gross injustice," primarily to Society and, secondarily, to Smith's cofelons, Almeida and Hough.