645 A.2d 257

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Martin STIVALA, Appellant.**

Superior Court of Pennsylvania.

Argued March 17, 1994.

Filed July 26, 1994.

**2.** The trial court, believing the order to be self-explanatory, has not written an opinion.

178

Gary B. Zimmerman, Pittsburgh, for appellant.

Kemal A. Mericli, Asst. Dist. Atty., Pittsburgh, for Com., appellee.

Before WIEAND, DEL SOLE and HUDOCK, JJ.

HUDOCK, Judge:

This appeal is from the judgment of sentence imposed upon Appellant following a jury trial in which he was convicted of

various crimes involving the burning of a building. Appellant was charged with three counts of arson,[1] criminal conspiracy,[2] and second degree murder (felony murder).[3] Appellant was convicted of two of the three counts of arson, but was acquitted of the charge of arson with intent to collect insurance money. The jury was unable to reach a verdict on the second degree murder charge and a mistrial was granted.[4] Post-trial motions were filed and denied by the court. Appellant was sentenced to imprisonment for four to twelve years. This appeal followed. We affirm.

The facts as summarized by the trial court are as follows:

Judy Johnson testified that she was in the bedroom of her Braddock home during the early morning hours of May 16, 1985, when she heard someone screaming. She went outside and observed that the house next to hers was on fire. She immediately alerted the fire department (N.T. 10/10/91, pp. 75–79).

Michele Smith, another neighbor, stated that she also heard someone screaming. When she looked outside, she saw a man engulfed in flames running down the street. Someone covered the man with a blanket and placed him in the back of a white car (N.T. 10/10/91, pp. 87–90).

David Peterson testified that the property in question (119 Seventh Street, Braddock) was acquired by him in 1979 or 1980 as a partial payment for work that he had performed. The house was run-down and needed extensive repair work. After discussions about the property with John Stivala, who was a general contractor, on May 5, 1983, Peterson deeded the property from himself to him and John Stivala (Commonwealth Exhibit 11). The men planned to renovate and rent the property. John Stivala and Peterson then applied for a loan, the proceeds of which were deposited into a joint checking account to be used to undertake the

---

1. Under 18 Pa.C.S. §§ 3301(a)(1)(i), 3301(c)(2) and 3301(c)(3).

2. 18 Pa.C.S. § 903.

3. 18 Pa.C.S. § 2502(b).

4. After trial, the court granted a *nolle prosequi* to this charge on motion of the prosecution.

renovations. The renovations began and were about 70–80% complete when Peterson left town in February, 1984. Peterson testified that John Stivala never told him that he had purchased insurance on the property and that he (Peterson) heard about the fire from someone other than John Stivala within a week after it happened (N.T. 10/10/91, pp. 192–228).

Robert DeSantis, a detective with the Allegheny County Police Department, testified that based upon his experience and his investigation of the fire scene, the fire was incendiary in nature. Detective DeSantis defined incendiary as "[s]tarted with an accelerant or some other type of object." (N.T. 10/10/91, pp. 402, 412).

John Lopez, testifying in exchange for the Commonwealth's agreement not to charge him with any offenses arising out of the incident, stated that he, [Appellant], and Donald Dailey were fraternity brothers at California State University. A few days prior to the incident, Lopez observed Dailey on the porch of the fraternity house. Dailey was pouring gasoline on a cement block and lighting it. He started a small fire with a lit cigarette, newspaper and a small amount of gunpowder. Dailey told Lopez that he might burn down a house for [Appellant]. He then offered Lopez $100 to drive the car for him. Dailey told Lopez that after he burned the house down, [Appellant] would get the insurance money and pay $3,000 (N.T. 10/10/91, pp. 624–641).

Lopez's next contact with Dailey was on Wednesday, May 15, 1985, when Dailey pulled into the parking lot of the fraternity house in a white Chevette. Dailey exited the vehicle and asked Lopez if he was ready to go. Lopez stated he was ready and Dailey threw some items, including a gas can, into the trunk of the car. The men left the fraternity house with Dailey driving. Dailey told Lopez that they had to stop at Stivala Construction to pick up the keys and directions to the house. When they stopped at the construction company, [Appellant] took Dailey into a back room where they had a discussion. As they were leaving,

[Appellant] told Dailey to be careful. When they got back in the car, Dailey pulled a key and a piece of paper with writing on it out of his pocket and set them on the console. They then proceeded to the house in Braddock, following the directions on the piece of paper. Upon arriving at the house, the two men went inside where they found empty beer bottles, wine bottles, mattresses, burned candles, and other debris. After walking around for a short time, they left and went to Dailey's home in the Baldwin section of Allegheny County (N.T. 10/10/91, pp. 651-657).

After eating dinner and taking a nap at the Dailey family home, the two men left and headed toward the house in Braddock. On the way, they stopped at an AM/PM Mini-mart and filled up the gas can. When they arrived at the house, Dailey exited the vehicle and retrieved the gas can from the back seat. Lopez parked the vehicle around the corner. About 10 to 15 minutes later, Lopez heard an explosion. He heard Dailey call his name. He ran to the corner where he saw Dailey engulfed in flames. He ran toward him and told him to roll on the ground. As this procedure did not douse the flames, someone wrapped Dailey in a blanket and put him in the back of a car and proceeded to Braddock General Hospital (N.T. 10/10/91, pp. 667-673).

Lopez proceeded to the hospital. While there, he was interviewed by a Braddock police officer. He told the police officer, "... that Don Dailey got out of the car and went to the side of the building to urinate and the explosion happened." Lopez then called the fraternity house to tell his "brothers" what had happened. Initially, he called the pay phone at the fraternity house and told the student who answered to tell Al Neis to go to the telephone in Michael Varga's room and accept a collect call. When Lopez called Varga's telephone, Neis answered and Lopez told him that Don had been in an accident and had been injured severely when he went next to a building to urinate and the building exploded. [Appellant] then got on the other end of the phone and asked Lopez "what really happened?" Lopez

stated that he told him, "... I left Don, Don went in the house and I pulled around the corner and that's when the explosion happened, the glass, that's when Don came out of the house on fire." Shortly thereafter, Lopez left the hospital and returned to the fraternity house, where he arrived about 3:00–3:30 a.m. (N.T. 10/10/91, pp. 667–682). Upon his arrival, he was greeted by [Appellant] and his brother, Mark. After a discussion about what had happened, [Appellant] told him to tell the police that he had "no comment." (N.T. 10/10/91, pp. 682–683).

Albert Neis testified that he answered Michael Varga's phone on the night of the fire. Lopez told him that Don had been badly burned in an explosion. He testified that [Appellant] then grabbed the phone from him and said, "Lopez, what really happened." After a short conversation, [Appellant] hung up the phone and placed another call. The first thing he said to the person on the other end was "Don got burned"; then after arguing with that person, he said, "what do you want me to do about it now?"; then after more arguing, he said, "we're leaving right now." (N.T. 10/10/91, pp. 869–873).

The Commonwealth offered the testimony of several fraternity brothers who corroborated the testimony of Mr. Neis. They testified that [Appellant] had complained about a piece of property located in Braddock that was a problem.

Trial Court Opinion, 4/12/93, at pp. 2–6. Dailey subsequently died from his injuries sustained in the fire. The procedural history of this case was also summarized by the trial court as follows:

The matter was originally assigned to the Honorable Patrick McFalls, who denied a defense motion to dismiss the murder charges on the grounds that the *allegata*, even if proven, did not constitute a sufficient basis for a finding of Second Degree Murder. With Judge McFalls' permission, the defense appealed his order to the Superior Court, which denied the motion for an interlocutory appeal and remanded the matter to the trial court.

As Judge McFalls had been transferred to the civil division, the matter was reassigned to [Judge Raymond A. Novak]. Thereafter, the defense filed a Motion to Reconsider the decision of Judge McFalls. After reviewing the applicable case law, this court determined that as there were no compelling circumstances present in this case, it should not reverse the decision of a court of co-equal jurisdiction. Moreover, the court determined that Judge McFalls' decision was correct and therefore, a denial of the request for reconsideration was proper.

After hearings on several pre-trial motions, which were taken under advisement pending the filing of briefs, the parties contacted the court and requested a conference. At the conference, the District Attorney stated that he intended to *nolle prosse* all charges against John Stivala and the homicide charges against [Appellant]; in exchange, [Appellant] would plead guilty to one count of Arson and receive a sentence of ten years probation. After hearings, arguments and the filing of briefs ..., the motions of *nolle prosequi* were disapproved. Subsequently, the defendants filed motions requesting that the court recuse itself. These motions were denied, as were defense Motions for Administrative Review of the Trial Judge's Denial of the Defendant's Recusal Motion....

The trial was then postponed by the Commonwealth due to the unavailability of several witnesses who were stationed in the Middle East during Operation Desert Storm. In the fall of 1991, the defense filed a Motion to Reconsider the denial of the Motion to Recuse. On September 24, 1991, this court denied the request for reconsideration. The defense filed a Notice of Appeal with the Superior Court. After response by the Commonwealth, the appeal was quashed.

Finally, on October 10, 1991, the trial in this matter began.

Trial Court Opinion at pp. 7–8.

Appellant raises the following issues:

I. Whether the trial court violated the United States Constitution and the Pennsylvania Constitution mandating separation of powers principles by refusing to sign a *nolle prosequi* presented by the District Attorney's office which was based on the grounds that there was insufficient evidence to justify continued prosecution for murder in the second degree.

 A. Whether the trial court's unconstitutional and unlawful order required Appellant to be tried for murder joined with his trial for arson thereby denying him due process of law and a fair trial.

II. Whether the court erred in denying Appellant's motion for recusal.

III. Whether the trial court erred in admitting hearsay statements into evidence at trial.

IV. Whether the prosecutor's request for a stipulation so that the physical evidence need not be produced and failure to inform Appellant that the physical evidence had been lost is prosecutorial misconduct, which requires a reversal and a new trial.

V. Whether the prosecutor's attempt to prejudice Appellant before the jury by attributing to him a pejorative and irrelevant reference to race comprises prosecutorial misconduct.

VI. Whether there was sufficient evidence to submit the charge of second degree murder for the jury's consideration.

 A. Whether the submission of the charge of second degree murder for the jury's consideration prejudiced the Appellant's right to a fair trial on the charge of arson.

VII. Whether remarks by the trial court in supplemental instructions to the jury comprised an impermissible reference to Appellant's silence.

VIII. Whether the Appellant was denied due process of law where the District Attorney's office proceeded to trial on the charge of murder in the second degree (felony murder) after announcing in a motion to *nol pros,* that there

was not a basis in law or fact that supported the charge of felony murder.

Appellant's Brief at p. 3.

We first address the issue raised regarding the proceedings which took place pre-trial. Appellant claims that the court erred in denying the Commonwealth's motion for a *nolle prosequi* and has devoted extensive argument to his claim. Appellant contends that the trial court was without power to deny the Commonwealth's motion for *nolle prosequi* because the Commonwealth has discretion whether to prosecute a matter, and for a court to interfere with that decision is a violation of the constitutional guarantee of the separation of powers. In effect, Appellant claims that the judicial branch may not intervene here to usurp the discretion of the executive branch.

We begin our discussion by citing Pa.R.Crim.P. 313, 42 Pa.C.S. It reads in pertinent part:

(a) Upon motion of the attorney for the Commonwealth, the court *may,* in open court, order a nolle prosequi notwithstanding the objection of any person. (Emphasis added).

Historically, at common law, a prosecutor had the authority to enter a *nolle prosequi* on his own motion. *See Commonwealth ex rel. Thor v. Ashe,* 138 Pa.Super. 222, 11 A.2d 173 (1939). This unfettered power was modified by the Acts of May 3, 1850, P.L. 654, and the Criminal Procedure Act of 1860, which required that before a *nolle prosequi* could be entered, the assent of the proper court must be obtained. *Id.*

More recently, our Supreme Court stated in *Commonwealth v. DiPasquale,* 431 Pa. 536, 541, 246 A.2d 430, 432 (1968):

The grant or refusal of a petition for nolle pros and for a continuance lies within the sound discretion of the lower Court, and its action will not be reversed in the absence of an abuse of discretion. (Citations omitted).

In *DiPasquale,* the Supreme Court held that the rights of the defendant required that a *nolle prosequi* be denied, thereby compelling the Commonwealth to go to trial. The facts in *DiPasquale* showed that the Commonwealth had been granted

numerous continuances, and, when the case was finally called for trial, the Commonwealth indicated that it would not be able to make out a *prima facie* case against the defendant and was therefore requesting a *nolle prosequi.* The trial court held that the defendant's right to a speedy trial would be violated if the *nolle prosequi* were granted and it, therefore, denied the petition. On appeal, the Commonwealth contended that:

> it is the District Attorney's province and power to prosecute an indicted defendant at such time and in such a manner as he deems appropriate and wise, and consequently the lower Court had no power to order the trial to be held without the District Attorney having moved for trial, and that the trial was therefore a nullity and the verdicts of not guilty are null and void.

*Id.* at 540, 246 A.2d at 432. Our Supreme Court disagreed with the Commonwealth, and reinforced the principle that the district attorney's discretion is not unfettered. Clearly, the court's ruling is aimed at protecting the rights of defendants.

Appellant, in our case, argues that although the court could protect the rights of defendants, there is nothing to permit the court to protect the public good in denying a *nolle prosequi,* and thus forcing a defendant to go to trial. We disagree.

A recent Supreme Court decision, *Commonwealth v. Benz,* 523 Pa. 203, 565 A.2d 764 (1989), involved the decision by a district attorney not to prosecute a defendant police officer who shot an individual during an altercation at a hospital in Pittsburgh. Although the coroner recommended charges be filed for voluntary manslaughter, the district attorney refused. Subsequently, the mother of the victim filed a private complaint. This private complaint was denied by the district attorney on the grounds that there was insufficient evidence to make out a *prima facie* case. The trial court accepted a petition by the victim's mother for review, but denied relief. She sought review in the Superior Court which determined that there was sufficient evidence to make out a *prima facie* case. The Commonwealth appealed to the Supreme Court. The Supreme Court held that the determination of the suffi-

ciency of evidence is a judicial function, and does not implicate the prosecutorial discretion of the district attorney. The Supreme Court held:

> The prosecutor in this instance never purported to predicate his decision not to prosecute upon the exercise of his prosecutorial discretion to make policy. He expressly stated that the decision to decline prosecution resulted from his determination that the evidence would not sustain a *prima facie* case. Thus the issue before both lower courts required an assessment of that legal judgment and not an intrusion upon prosecutorial discretion. Had the district attorney utilized policy discretion to refuse prosecution and had the lower courts reviewed that decision, the question of separation of powers would have been appropriately raised.

*Id.* at 209–10, 565 A.2d at 768.

We note, however, that *Benz* involved the rule of criminal procedure dealing with private complaints. That rule, Pa. R.Crim.P. 133, 42 Pa.C.S., gives the prosecuting attorney discretion over whether they approve or disapprove a private complaint. Rule 133 states in pertinent part:

> (b) If the attorney for the Commonwealth
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (2) Disapproves the complaint, the attorney shall state the reasons on the complaint form and return it to the affiant. Thereafter the affiant may file the complaint with a judge of a Court of Common Pleas *for approval or disapproval*[.] (Emphasis added).

The clear language of this rule indicates that although the prosecuting attorney has discretion over whether to prosecute based upon the filing of a private complaint, that discretion is not unfettered, and necessarily involves review by the trial court.

The plain language of the rule involved in our present case, Pa.R.Crim.P. 313, 42 Pa.C.S., affords prosecutorial discretion to the Commonwealth's attorney, but that discretion is not unfettered and is subject to review by the trial court. As we stated previously, the rule states that the trial court *may*

order a *nolle prosequi* upon motion of the Commonwealth's attorney. It is the nature of that review that is at question here.

The Commonwealth stated, in its motion for *nolle prosequi*, that it did not believe there was sufficient evidence to make out a *prima facie* case against Appellant. It was based on this rationale that the motion was made. From the Supreme Court's decision in *Benz, supra*, it is apparent that the determination of whether there was sufficient evidence to sustain a *prima facie* case is ultimately a judicial one and subject to the trial court's determination. That is precisely what the trial court did. It heard argument and had the record before it. Based on that pretrial state of the evidence, it determined that there was sufficient evidence to make out a *prima facie* case and, therefore, denied the Commonwealth's motion for *nolle prosequi*. We cannot say that the trial court abused its discretion in ruling as it did.

Appellant cites two decisions which we address here as distinguishable from the facts of our present case. First, Appellant relies heavily on our decision in *Commonwealth v. Buonopane*, 410 Pa.Super. 215, 599 A.2d 681 (1991), *alloc. den.*, 530 Pa. 651, 608 A.2d 27 (1992). Appellant contends that *Buonopane* is directly on point with his argument that the district attorney's discretion can only be overruled upon a finding of "bad faith, fraud, capricious action or abuse of power[.]" *Id.* at 221, 599 A.2d at 684. *Buonopane* involved the prosecutor's decision to seek the death penalty in a murder case. The defendant filed a pretrial petition to review that decision, and the trial court granted the defendant's motion after it heard testimony and found no aggravating circumstances existed to warrant treating the case as a death penalty case. On appeal, the Commonwealth argued that the trial court abused its discretion in conducting a hearing into the prosecutor's discretionary decision. We reversed, stating that the trial court did not have the power to inquire into the nature of the case as capital or noncapital pretrial. We relied on the reasoning in *Commonwealth v. Bullock*, 471 Pa. 292, 370 A.2d 309 (1977), which stated that absent a pertinent

statute empowering the court to review the pretrial procedure involved here, there was no authority for its action.

*Buonopane* is clearly distinguishable from our present case because it involved a situation where the prosecutor's discretion was *not* modified by the legislature in such a way as to give power of review at that stage to the trial court. In our present case, Rule 313 does give that power in the discretionary language of the rule itself.

Finally, Appellant relies on the Supreme Court's decision in *Commonwealth v. Johnson*, 507 Pa. 27, 487 A.2d 1320 (1985), in support of his position that the district attorney's discretion should not be overruled by the trial court, which merely acts in a ministerial capacity in approving requests for immunity protection. Appellant claims that the order of *nolle prosequi* is similarly a ministerial act. We disagree.

*Johnson* was decided based upon 42 Pa.C.S. § 5947, which reads in pertinent part:

**(b) Request and issuance.**—The Attorney General or a district attorney may request an immunity order from any judge of a designated court, and that judge *shall* issue such an order, when *in the judgment of the Attorney General or district attorney . . . .* (Emphasis added)

Clearly, the language of the immunity statute requires the court to grant the immunity request based entirely upon the decision to seek it by the Attorney General or district attorney. There is no discretion given to the trial court, and clearly, therefore, the grant of an order of immunity is a ministerial act. This is unlike our present case, which involves language both in Pa.R.Crim.P. 313 and 42 Pa.C.S. § 8932, giving power to the trial court to review the Commonwealth's attorney's decision. We are not persuaded by Appellant's argument.

Before we leave the discussion of this issue, we note that Appellant claims that there was error pretrial concerning the sufficiency of the evidence. After trial, Appellant seeks to attack that pretrial ruling on sufficiency. We surmise that Appellant is arguing that the error by the trial court was in

permitting the case to go forward after the Commonwealth conceded that it had insufficient evidence to prove guilt beyond a reasonable doubt. This assessment by the Commonwealth came pretrial but after the grand jury investigation and coroner's inquest. Although Appellant's motion was for reconsideration of the trial court's denial of the *nolle prosequi*, in reality it was in the nature of a *habeas corpus* petition claiming that he was being improperly detained on insufficient evidence. *Commonwealth v. Hess*, 489 Pa. 580, 414 A.2d 1043 (1980). We must not lose sight of the fact that Appellant is asking us to review a pretrial determination of the sufficiency of the evidence (by the finding of a *prima facie* case at the preliminary hearing) after he has been tried and found guilty of some of the charges. Although we have reviewed the trial court's decision to deny the *nolle prosequi*, we have not reviewed whether there was sufficient evidence itself pretrial to determine its sufficiency. To do so would be improper since there has now been a subsequent independent judicial judgment that there was sufficient evidence. *Commonwealth v. Ballard*, 501 Pa. 230, 460 A.2d 1091 (1983). It is the sufficiency of the proof at trial that is relevant, once the trial is concluded.

Appellant claims in his sixth issue that there was insufficient evidence to submit the charge of second degree murder to the jury. Appellant argues that the court should not have placed the charge of second degree murder before the jury, along with the other charges, when he claims the case law as applied to the facts would not support such a conviction. Appellant has asserted no bad faith on the part of the Commonwealth in charging Appellant with second degree murder, and he has likewise failed to support his argument that under these circumstances the mere submission of the offenses creates impermissible prejudice. Having failed to convict Appellant of the offense of second degree murder, the jury obviously was able to assess the facts and law, but was unable to render a verdict. Moreover, after trial, the Commonwealth agreed to *nol pros* the second degree murder

charge. We perceive no prejudice and find that Appellant's argument lacks merit.

Next we address Appellant's second issue, that the trial judge abused his discretion in failing to recuse himself after defense motions pretrial. The trial court denied Appellant's motion to recuse and also denied a motion to convene a court *en banc* to consider the recusal issue. Appellant presented a motion to President Judge Zavarella to remove the trial judge, and the motion was denied. Approximately two years later, Appellant moved the court to reconsider the motion to recuse, which was denied. As our Supreme Court stated in *Reilly by Reilly v. Southeastern Pa. Transp.*, 507 Pa. 204, 221–22, 489 A.2d 1291, 1300 (1985):

> It is incumbent upon the proponent of a disqualification motion to allege facts tending to show bias, interest or other disqualifying events, and it is the duty of the judge to decide whether he feels he can hear and dispose of the case fairly and without prejudice because we recognize that our judges are honorable, fair and competent. Once this decision is made, it is final and the cause must proceed. The propriety of this decision is grounded in abuse of discretion and is preserved as any other assignment of error, should the objecting party find it necessary to appeal following the conclusion of the cause.

> If the cause is appealed, the record is before the appellate court which can determine whether a fair and impartial trial were had. *If so, the alleged disqualifying factors of the trial judge become moot.* (Emphasis in original)

Our task, then, is to determine whether Appellant received a fair trial. We note, however, that Appellant has failed to cite to any pertinent portions of the voluminous trial record in support of a claim that he did not receive a fair trial. Although we may consider this an undeveloped argument, pursuant to Pa.R.A.P. 2119, 42 Pa.C.S., and *Commonwealth v. Sanford*, 299 Pa.Super. 64, 445 A.2d 149 (1982), we nevertheless reviewed the trial transcript in order to evaluate Appellant's co-defendant John Stivala's sufficiency claim and will,

therefore, address Appellant's recusal claim. After having reviewed the entire transcript of the trial, we are convinced that Appellant received a fair trial. Several witnesses were called by the Commonwealth with extensive cross-examination by counsel for both Appellant and John. Several objections were lodged by all counsel and extensive side-bar conferences on and off the record were held. Taken in its entirety, there is nothing to indicate that Appellant's trial was anything less than fair. Therefore, Appellant's claim fails.

Next, Appellant claims that the trial court improperly admitted hearsay statements into evidence. Appellant claims that Michael Juliano, John Lopez, Patrick Ferrell, Hubert Ramsey, Richard Rhodes, and Albert Neis all gave improper testimony implicating Donald Dailey. It is hornbook law that hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Hearsay is inadmissible unless there is a recognized exception under which the statement may be admitted. One such exception is the co-conspirator exception which states that:

> statements by a co-conspirator [may be] admitted against an accused if the statements are made during the conspiracy, in furtherance thereof, and where there is other evidence of the existence of a conspiracy.

*Commonwealth v. Moyers*, 391 Pa.Super. 262, 267, 570 A.2d 1323, 1326 (1990). This definition necessarily involves the determination of three elements: (1) other evidence of conspiracy; (2) during the conspiracy; and (3) in furtherance of the conspiracy.

Appellant complains that nine (9) statements were improperly admitted at trial: (1) Dailey told Juliano that he would burn down a house for $2,000, and Dailey asked Juliano to give him a ride to the property; (2) Dailey told Lopez he might burn a house down and asked Lopez to drive him. Dailey also said that he would get $3,000 for burning the house and Dailey would give Lopez $100 for helping him; (3) Dailey asked Ramsey how to burn a house and told Ramsey that he was going to do it for Appellant; (4) Dailey told Rhodes that he would not attend a softball game because

Dailey was going to burn a house down for $3,000; (5) Lopez told Neis that Appellant told Lopez not to talk to the police;[5] (6) Appellant told Juliano that the house was a bad investment and would pay several thousand dollars to burn it; (7) Appellant told Ferrell that he did not know whether Dailey would go through with burning the house down; (8) Appellant told Dailey to be careful, when Dailey and Lopez came to pick up the keys and directions to the house; (9) Appellant asked Lopez "what really happened?" when Lopez called the fraternity house from the hospital on the night of the fire, and Appellant told someone who answered the phone registered to John Stivala, "Don got burned." (Appellant's Brief at pp. 27–28, 30–31).

Of the statements listed above, numbers 6 through 9 are statements made by Appellant to persons who testified at trial. They are statements by a party and are, therefore, admissions. *See Commonwealth v. Galloway*, 302 Pa.Super. 145, 448 A.2d 568 (1982). The court properly admitted these statements as an exception to the hearsay rule. The remaining statements are made by either Dailey or Lopez, who are not parties. These statements are clearly out-of-court statements offered to prove the truth of the matters asserted, that is, whether Dailey conspired with Appellant to burn a house down for money. To be admissible under the co-conspirator exception to the hearsay rule, there must be sufficient independent evidence of the conspiracy. The alleged conspiracy in this case involves burning a house down to collect insurance proceeds. Our courts require that the existence of a conspiracy be established by a preponderance of the evidence. *See Commonwealth v. Cherpes*, 360 Pa.Super. 246, 520 A.2d 439 (1987), *alloc. den.*, 515 Pa. 612, 530 A.2d 866.

**5.** We note that this is hearsay within hearsay. To be admissible, each part of the statement must be admissible under a recognized exception. *See Commonwealth v. Galloway*, 302 Pa.Super. 145, 448 A.2d 568 (1982). Appellant's statement to Lopez not to talk to the police is an admission by Appellant. Lopez agreed to help Dailey set the fire by driving him to the house. Dailey is clearly a co-conspirator with Lopez. Lopez's statement, then, is admissible as a statement of a co-conspirator.

In our present case, the other evidence at trial which establishes the existence of a conspiracy for purposes of the co-conspirator exception was that John Stivala and Appellant were overheard by Fazekas, one of John Stivala's employees, complaining about the property as a bad investment. John Stivala took out an insurance policy on the property in February, 1985. Appellant mentioned to Juliano that he owned the house and that the renters were not paying enough to keep up the mortgage payments. In March 1985, in a conversation at the fraternity house, Appellant said he would be willing to pay someone to burn the house down so that the insurance could be collected. On the night of the fire, Appellant spoke to John Lopez, who was calling from the hospital to say that Dailey had been burned in the fire. Appellant asked, "What really happened?" Lopez told Appellant that the house was burned in a big fire. Lopez and Dailey drove to Stivala Construction on the night of the fire. Dailey went into the back room, and when he came out Appellant told him to be careful. After Appellant had learned of the fire and Dailey's injury, Appellant placed a phone call at 1:50 a.m. to a number registered to John Stivala, and the first words upon connection of the call were, "Don got burned." This evidence is sufficient independent evidence of a conspiracy to satisfy the first prong of the test for the co-conspirator exception. Appellant does not challenge either of the other two requirements of the co-conspirator exception. Taken as a whole, we agree, therefore, with the trial court that there was sufficient independent proof of the conspiracy, and we need not address the other requirements of this exception. The trial court properly admitted statements 1 through 5 above as statements by a co-conspirator.

In Appellant's fourth issue he claims that there was prosecutorial misconduct committed when the Commonwealth stipulated to physical evidence collected at the fire scene without informing Appellant that the evidence had been lost. The record reflects that during the cross-examination of Robert DeSantis, county police officer acting as fire marshal at the time of this fire, Officer DeSantis admitted that, after having

seized a gas can and other physical items from the scene, he placed them in containers or bags and placed them in the trunk of his car. These items remained there for several hours while he conducted further investigation on the fire. At some point, those items were transferred to the police department who then sent them to the crime lab for evaluation. Officer DeSantis testified that the items were then placed in an evidence locker. Appellant's counsel questioned Officer DeSantis extensively on the procedures he used to secure the items, as well as the significance of gas fumes found on those items tested by the crime lab. Officer DeSantis testified that it would be possible to contaminate an item with fumes if the containers were not air tight. Officer DeSantis then testified that he was not able to locate the gas can or other items sent to the crime lab. An extensive sidebar took place during which Appellant asked for a mistrial.

The record shows that before trial the Commonwealth and defense counsel agreed not to require the physical presence of the gas can and other physical items obtained at the scene or from Dailey himself. When it became known that the physical items were missing, Appellant moved for a mistrial stating that the Commonwealth should have informed him that the items were missing.

Essentially, Appellant argues that the Commonwealth had a duty to disclose evidence under Pa.R.Crim.P. 305, 42 Pa.C.S. All parties agreed that, at the time they agreed not to require the physical presence of these items, the Commonwealth did not know they were missing. The Commonwealth admitted that, at the point when the jury was selected, someone went to locate these items and it was at that point they were discovered to be missing. The Commonwealth stated that it did not inform the defense because it did not consider it important. The trial court ruled that, although the Commonwealth probably should have mentioned it, this was not a serious enough discovery violation to warrant a mistrial. The parties agreed to stipulate that all the physical evidence was missing. The court so informed the jury. Likewise, the court permitted the defense to cross-examine witnesses as they felt necessary concerning the evidence as having been missing. This was

done most effectively. Officer DeSantis had conceded that it was possible that gas fumes could have been found on the items as a result of their having been in his trunk for several hours. He was unable to remember whether the gas can had a lid.

> If at any time during the course of the proceeding it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

Pa.R.Crim.P. 305(E), 42 Pa.C.S. After having reviewed the testimony concerning the physical evidence, it is apparent that Appellant effectively cross-examined the witness concerning the missing items. This was to the benefit of Appellant. We do not perceive any abuse of discretion by the trial court in denying Appellant's motion for a mistrial.

 Next, Appellant claims that the Commonwealth committed prosecutorial misconduct because of a reference in testimony, by a Commonwealth witness, to the tenants of Appellant's house as "black". Appellant contends that the racial reference improperly prejudiced him. During questioning of Michael Juliano, the Commonwealth asked him:

> [THE COMMONWEALTH]: Did he [Appellant] characterize any of his potential renters in any particular way?
>
> A. He mentioned the fact that they were black and—

N.T., 10/31/91, p. 497. At this point the defense objected and an extensive sidebar conference took place during which both sides argued concerning this testimony. The Commonwealth had expected the witness to say that Appellant had referred to these tenants as "niggers".

> It is central to our concept of a fair trial that the jury must decide the case on the basis of properly presented factual issues, and that extraneous and irrelevant matters should be avoided. Appeals to racial or religious prejudice are especially incompatible with the concept of a fair trial

because of the likelihood that reason will be dethroned and that bias and emotion will reign.

*Commonwealth v. Tirado,* 473 Pa. 468, 472–73, 375 A.2d 336, 338 (1977). Although Appellant would have us find that the reference to "black" tenants was sufficient to warrant a mistrial, we disagree and find that the trial court's disposition of the matters adequately addressed the situation, and adopt that portion of the trial court's opinion as follows:

Testimony that [Appellant] referred to the tenants of 119 Seventh Street as "niggers" would have been relevant and probative of whether his state of mind was reckless, specifically whether he disregarded a risk of damage to Mrs. Johnson's immediately adjacent frame home such that considering the circumstances known to him, his disregard involved a gross deviation from the standard of conduct that a reasonable person would observe in the [Appellant's] situation. The prosecutor violated no discovery rule as he was unaware of this information until immediately prior to calling the witness. Nevertheless, because some of the jurors were black, the court found that fairness required that he should have appraised the defendants of this fact before eliciting the testimony from the witness. The witness, however, did not used [sic] the word "nigger" as the prosecutor expected him to do. The witness used the word "black". Given the timely objection and the court's ruling, the expletive was never elicited.

The court's instruction to the jury occurred the next morning after the trial was recessed upon this objection. The court was careful not to repeat any reference to race. Moreover, the court took the extraordinary measure of having an extensive offer of proof with regard to the remaining witnesses placed on the record before the witnesses were called in order to fully appraise the defendants to any facts which the prosecutor learned immediately prior to calling the witness.

Trial Court Opinion at pp. 25–26.

In Appellant's seventh issue, he claims that the trial court improperly instructed the jury by referring to his silence.

More specifically, Appellant complains of a supplemental instruction given by the court in response to the following jury question: "How much common sense and circumstantial evidence should be used in the jury's decision. Possibly redefine circumstantial evidence, jurors duty as judges of the facts and what is proof?". N.T., 10/30/91, p. 199. We note that when evaluating a jury charge, we must read it in its entirety and not look at isolated excerpts. *Commonwealth v. Prosdocimo*, 525 Pa. 147, 578 A.2d 1273 (1990). "The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Id.* at 150, 578 A.2d at 1274.

Appellant claims that the following portion of the supplemental instruction improperly referred to his silence:

How do you know what a person's intention was? One way you know is when they tell you what their intention is. But often times you have no idea what a person's intention is based upon his words because you don't have his words to consider. So in order to determine what was on a person's mind you consider circumstantial evidence, such as what the person did to indicate to you what was in the person's mind.

N.T., 10/30/91, p. 201. We have reviewed the entire supplementary instruction which covered redefining direct and circumstantial evidence and reasonable doubt. We find that in context as a whole, this instruction accurately reflects the law and does not improperly implicate Appellant's silence.

■ Finally, Appellant argues that his due process rights were violated when the Commonwealth proceeded to trial on the second degree murder charge, despite its statement that neither the law nor the facts supported such a charge. While similar to Appellant's first issue, the difference we perceive here is that Appellant would have us find after trial that the conduct of the Commonwealth in pursuing charges was so egregious as to deprive Appellant of due process of law in just facing those charges.

This is not a case in which charges were filed that had no basis in fact or law relative to the case. The charge of felony murder was filed to charge Appellant with responsibility for the death of a co-actor who died during the commission of the underlying crime of arson. Appellant bases his claim on the reasoning that the Commonwealth moved for a *nolle prosequi,* stating there was insufficient evidence to sustain a conviction. The trial court extensively examined the facts and law and determined that there was sufficient evidence to hold Appellant for trial on the charge of second degree murder. We agree. There is no showing of bad faith on the part of the Commonwealth, and the law is not so clear as to state unequivocally that no responsibility lies for a co-actor not present at the scene of the felony. To that end, we adopt the following portion of the trial court opinion which discusses the law of felony murder and holds that Appellant's due process rights were not violated:

In *Commonwealth v. Bolish,* 391 Pa. 550, 138 A.2d 447 (1958), the Supreme Court of Pennsylvania held that an accomplice to an arson who actively participated in an arson and was present at the scene, was responsible for the death of his co-actor under the felony-murder doctrine, even though the co-actor's death resulted from his own act in perpetration of the arson. While the fact of the co-arsonist's presence at the scene was an important factor in the *Bolish* decision, *Bolish* leaves unanswered the question of the responsibility of an accomplice if he is not present at the scene. The Commonwealth had heretofore argued, and we believe correctly, that *Bolish* should not be interpreted to preclude the application of the [felony-murder] doctrine to an accomplice who was not at the scene. Judge McFalls ruled that a co-felon not present at the scene is also culpable under the felony-murder rule.

Despite the fact of Judge McFalls' decision and the Superior Court's refusal to review that decision, the District Attorney took it upon himself to re-study the matter and engage in a nationwide search of the law of other states. To that end, the Commonwealth cites two cases: *Woodruff*

*v. California,* 47 Cal.Reporter 291, 237 Cal.App.2d 749 (1965), and *Missouri v. Light,* [577] S.W.2d 134 (1979). It is our understanding that when there are no binding precedents in the case law of Pennsylvania, it is proper to look to other jurisdictions for guidance. Though these decisions are not binding, their reasoning is often helpful.

* * * * * *

[In *Missouri v. Light*], the Missouri Court of Appeals reversed a manslaughter conviction under a junior grade version of the felony-murder doctrine known loosely as the misdemeanor-manslaughter doctrine for the death of a co-participant in a misdemeanor who was electrocuted while climbing a telephone pole for the purpose of ,stealing wire. The Court found that the defendant had been killed by an intervening agency which had the effect of thwarting rather than furthering the commission of the felony, a result similar to our Supreme Court's decision in the famous case of *Commonwealth v. Redline,* [391 Pa. 486] 137 A.2d 472 (1958). The Court's decision does not hinge on the fact that the co-participant was present at the scene of the crime. In fact, *Light* has an extensive discussion of the factor of a co-participant's presence at the scene in the application of the misdemeanor-manslaughter doctrine. What is even more interesting is that in considering the effect of presence at the scene of the crime on the application of the doctrine, the Missouri Court of Appeals discusses at length the decision of our own Supreme Court in *Bolish.* After reviewing *Bolish,* the Missouri Court of Appeals concludes:

> ... it is doubtful, however, that defendant's criminal responsibility for the death of his accomplice should depend upon whether or not the defendant was present. Any [causal] connection with the death, and any culpability therefore, would seem to be the same whether the defendant was or was not a witness to the unintended demise of his co-perpetrator if ... the defendant had sent two arsonists to the scene, could it be plausibly maintained that the defendant was blameless for the death but that the companion of the decedent was culpable? It

seems unlikely. *Missouri v. Light,* supra, 577 S.W.2d at 138.

The only case submitted to us by the Commonwealth which discusses the factor of "presence at the scene," concludes that criminal culpability for the death of a co-actor should not depend on the presence of the actor at the scene. This reasoning supports Judge McFalls' decision, and it does so by analyzing and interpreting the very case which is at issue, *Commonwealth v. Bolish.* As the Missouri Court of Appeals points out, the recent trend in the application of the felony-murder doctrine has been to bar application of the doctrine in cases where the decedent was a willing participant in the underlying felony *and* the death was caused by an outside agency, whether human or natural, which had the effect of thwarting rather than furthering the underlying felony. In the case at bar, the death of Donald Dailey was allegedly caused by the fire, a product of the alleged felony.

Finally, consider the following hypothetical case. A businessman hires two vagrants to burn down the factory of his competitor. During the course of the arson, one of the vagrants dies by his own hand. Under the interpretation of *Bolish* urged upon us by the parties, the second vagrant would be culpable for the murder of the first, but the businessman who had solicited the vagrants to commit the arson would not unless he was foolish enough to be present at the scene of the crime. Can this possibly be just? Such an interpretation of *Bolish* is not only wrong, it's absurd.

Trial Court Opinion, 7/13/89, pp. 19–22.

Judgment of sentence affirmed.